Received and Filed
06-4437
07/01/08
Marcia M. Waldron,
Clerk

No. 06-4437

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

LAUREN GAZZOLA,
Defendant-Appellant.

On Appeal From The Judgment
Of The United States District Court
For The District of New Jersey

**DEFENDANT-APPELLANT
LAUREN GAZZOLA'S REPLY BRIEF**

H. LOUIS SIRKIN (Ohio Bar No. 0024573)
SCOTT R. NAZZARINE (Ohio Bar No. 0079819)
JENNIFER M. KINSLEY (Ohio Bar No. 0071629)
SIRKIN PINALES & SCHWARTZ LLP
105 West Fourth Street, Suite 920
Cincinnati, Ohio 45202-2726
Telephone: (513) 721-4876
Facsimile: (513) 721-0876

Counsel for Defendant-Appellant Lauren Gazzola

# TABLE OF CONTENTS

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

I.   THERE WAS INSUFFICIENT EVIDENCE TO CONVICT GAZZOLA
     OF ANY OF THE INSTANT OFFENSES BECAUSE ALL
     ACTIVITIES ATTRIBUTABLE TO HER AND RELEVANT TO THE
     CRIMES CHARGED CONSTITUTED CORE POLITICAL SPEECH
     AND LAWFUL ASSOCIATION PROTECTED BY THE FIRST
     AMENDMENT, AND, AS A MATTER OF LAW SUCH
     CONSTITUTIONALLY PROTECTED ACTIVITIES ARE
     INSUFFICIENT TO FORM THE PREDICATE OF A CRIMINAL
     CONVICTION.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

     A.   Gazzola's Expressive Activities Could Not Be Proscribed
          Under the "Incitement" Doctrine.. . . . . . . . . . . . . . . . . . . . . . . . . 11

     B.   Ms. Gazzola's Expressive Activities Could Not be
          Punished Under the "True Threats" Doctrine. . . . . . . . . . . . . . . . . 18

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Signature of Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Combined Certification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

# TABLE OF AUTHORITIES

## Cases

*Brandenburg v. Ohio*, 395 U.S. 444 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . 11-18

*Chaplinsky v. New Hampshire*, 315 U.S. 568 (1942) . . . . . . . . . . . . . . . . . . . . . . . 9

*Dombrowski v. Pfister*, 380 U.S. 479 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . .9

*Hess v. Indiana*, 414 U.S. 105 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 17

*National Assoc. for the Advancement of Colored People v. Claiborne*
    *Hardware Co.*, 458 U.S. 886 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . 4, 26-28

*Planned Parenthood of the Columbia/Willamette, Inc. v. American*
    *Coalition of Life Activists*, 290 F.3d 1058 (9th Cir. 2002)    . . . . . . . 8, 20-25

*Police Dept. of Chicago v. Mosley*, 408 U.S. 92 (1972) . . . . . . . . . . . . . . . . . . . . . 8

*R.A.V. v. City of St. Paul*, 505 U.S. 382 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Rice v. Paladin Enterprises, Inc.*, 128 F.3d 233 (4th Cir. 1997) . . . . . . . . . . . . . 28

*Texas v. Johnson*, 491 U.S. 397 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Bell*, 414 F.3d 474 (3rd Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Bellrichard*, 779 F.Supp. 454 (D.Minn. 1991) . . . . . . . . . . . . . 19

*United States v. Fenton*, 30 F.Supp.2d 520 (W.D. Pa. 1998) . . . . . . . . . . . . . . . 19

*Unites States v. Zavrel*, 384 F.3d 130 (3rd Cir. 2004) . . . . . . . . . . . . . . . . . . . . 18

*Virginia v. Black*, 538 U.S. 343 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Watts v. United States*, 394 U.S. 705 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . 7, 18

*Whitney v. California*, 274 U.S. 357 (1927) . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-9

## Statutes

Unites States Con., amend. 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

18 U.S.C. § 2261A(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 26

# INTRODUCTION

Upon a thorough review of the Consolidated Brief of the Appellee, two significant observations are immediately apparent. The first is that, undoubtedly, some unpleasant, unfortunate, and at times outrageous things happened to persons as a result of their association with Huntingdon Life Sciences ("HLS"). These acts, including vandalism, property damage, harassment, and one isolated act of violence, were only a small portion of the broader sociopolitical campaign promoted by Stop Huntingdon Animal Cruelty ("SHAC"). But the second, more important, observation is that the government has never proven that any of these acts can be legally attributed to Ms. Gazzola or any of her co-Defendants in this case consistent with the constitutional protections guaranteed by the Due Process Clause and the First Amendment to the United States Constitution. And for this reason, as a matter of law there was insufficient evidence to convict Ms. Gazzola on any of the crimes charged.

Although it is unarguable that Gazzola was heavily involved with SHAC, a social and political campaign with the express purpose of stopping animal testing at HLS, there was no evidence at trial that this campaign (or any other implicit or explicit agreements made by Gazzola) had any unlawful purpose, nor that Gazzola possessed the requisite intent to commit any of the illicit acts committed by others. Similarly, although it is indisputable that Gazzola may have at times condoned,

applauded, and even advocated the illegal actions of others, as will be shown below it is equally irrefutable that, when analyzed under well-established and longstanding constitutional standards, her speech and association with other activists did not fall within any of the narrow exceptions to the First Amendment's protections; and thus, *a fortiori*, her association and speech could not legitimately give rise to criminal liability under any of the government's theories of the case. Simply put, there was insufficient evidence that Gazzola committed any illegal acts, aided and abetted others in committing any illegal acts, or conspired with others to do so.

In its attempt to convict Ms. Gazzola, the Government at trial improperly piled inference upon inference upon inference in order to conflate evidence of the legitimate and lawful campaign to protest animal cruelty with the independent acts of a few isolated extremists who used illegal means to further her same goals. Now, just as it did at trial, the Government in its Appeal Brief again uses not facts and evidence but instead sympathy for the plight of the victims and unfounded implications to erroneously and illegitimately confound "direct action" with violence, vandalism with threats, and the Defendants' words with the acts of others. Yet, despite the government's broad-brushed attempts to characterize Gazzola's actions as illegal simply by reference to the ephemeral consequences of a relatively few illegal acts committed by others, an individual's association with a sociopolitical

campaign is not the equivalent of an illegal conspiracy, and the government presented insufficient evidence to tie the former into the latter.

Perhaps even more troubling, the United States attempts to use Gazzola's speech, protests, and other First Amendment-protected activities in order to sweep her otherwise legal actions and associations into the government's vague, overreaching, dragnet conspiracy theories. However, such forbidden chains of inferences, built upon a foundation of innocent actions and constitutionally protected expressions are, as a matter of law, insufficient to sustain the convictions on any of the instant offenses.

It is respectfully submitted that, applying the correct constitutional analyses, the evidence clearly demonstrates that Ms. Gazzola's actions–though occasionally objectionable or obnoxious–were lawful; her speech–though sometimes offensive and impolitic–was protected by the First Amendment; her association and agreements with others–though perhaps in retrospect unwise–were made for legitimate purposes; and her intent–at all times and in all circumstances relevant to the instant charges–was non-criminal. Simply put, the government failed to show that Ms. Gazzola was engaged in anything but pure constitutionally protected speech, or was associating with others for anything but lawful purposes.

Thus, in convicting Ms. Gazzola, the jury must have lost its way by making the improper and inappropriate leap–based not on the evidence presented but upon impermissible sympathies and the government's unfounded implications–that Gazzola's relationships with others in a legitimate social campaign was tantamount to a conspiracy simply because some persons loosely associated with that campaign independently committed illegal acts.    However, as the Supreme Court has recognized, a massive and prolonged effort to change the social, political, and economic structure cannot be characterized as illegal simply by reference to the consequences of relatively few illegal acts; such a characterization must be supported by findings that adequately disclose the evidentiary basis for concluding that specific parties agreed to use unlawful means, that carefully identify the impact of such unlawful conduct, and that recognize the importance of avoiding the imposition of punishment for constitutionally protected activity. *See NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 934 (1982).  Put another way, the facts evinced at trial were legally insufficient to overcome Gazzola's presumption of innocence, and, accordingly, the trial court erred by permitting her to be held criminally liable as a principal, a conspirator, or as an aider and abettor of the illegal actions of others based solely on her constitutionally protected speech and activities.

In sum, it is submitted that it was a miscarriage of justice for the jury to have concluded–as they must have concluded to convict–that constitutionally protected political speech of some  must be repressed and criminalized because of the immoral or illegal acts of others.  This is truly the legal equivalent of killing the messenger, and such a punishment cannot stand–especially when the message is protected by the First Amendment.

## ARGUMENT

I.   **THERE WAS INSUFFICIENT EVIDENCE TO CONVICT GAZZOLA OF ANY OF THE INSTANT OFFENSES BECAUSE ALL ACTIVITIES ATTRIBUTABLE TO HER AND RELEVANT TO THE CRIMES CHARGED CONSTITUTED CORE POLITICAL SPEECH AND LAWFUL ASSOCIATION PROTECTED BY THE FIRST AMENDMENT, AND, AS A MATTER OF LAW SUCH CONSTITUTIONALLY PROTECTED ACTIVITIES ARE INSUFFICIENT TO FORM THE PREDICATE OF A CRIMINAL CONVICTION.**

In its Appeal Brief, the United States asserts that "the First Amendment does not protect the conduct forming the basis of the Defendants' criminal convictions," and "[t]he fact that the defendants had political motives and used speech during the course of violating the [law] ... is not a basis to set aside the convictions."  (112). Unfortunately, the Government's argument in this regard misstates the nature of the case, plays fast and loose with the evidence produced at trial, misapplies applicable

and controlling precedent to the facts of this case, and, overall, turns the operation of the First Amendment on its head.

The Government further argues that "[t]his case is not about whether the defendants have a First Amendment right to protest animal testing laboratories and seek to put HLS out of business through the power of persuasion. Of Course they do. This case is about whether the defendants can use *criminal* means, such as unlawful physical disruption with the intent to cause personal injury or property damage, to accomplish those objectives." (113, emphasis in original). However, contrary to the Government's suggestion, there was not a scintilla of evidence produced at trial that Gazzola personally committed any "unlawful physical disruption," any "property damage," nor certainly any "personal injury." The Government has not pointed to *any* evidence that Gazzola herself *even once* vandalized any property, sent any "black faxes," directly called any alleged victim without disclosing her identity, or directly threatened anyone. Indeed, as was pointed out in Gazzola's initial Appellant's Brief, the *only* activities that Gazzola was shown to have directly engaged in, which were in any way relevant to the indictment and convictions, included living in a home where SHAC computers were located, answering the telephone there, compiling research on and contacting animal testing companies, identifying herself as the SHAC campaign coordinator, taping an interview in Little Rock, attending several home

6

demonstrations, including one in Boston where she was arrested,[1] interviewing with a Seattle radio station, and communicating with and associating with other animal rights protestors. (*See* Gazzola Brief 9-10, 22-23). In other words, the evidence at trial failed to show that Ms. Gazzola and her co-Defendants were engaged in *anything but* sociopolitical protest and expressive activity–in fact, pure political speech on a controversial topic meant to bring about social change, spoken largely in the public forum, and directed to the lawful and legitimate aim of stopping what they perceived to be animal cruelty.

Thus, it is respectfully submitted that, despite the government's contention, the central issue in this case is *not* "whether the defendants can use *criminal* means" to accomplish their goals–of course they cannot. Instead, the issue *is* whether the means that the defendants *did* use–that is, their speech and association–can give rise to criminal liability consistent with the protections guaranteed by the U.S. Constitution. It is respectfully submitted that, as will be shown below, Ms. Gazzola's speech and

---

[1]All charges arising from Gazzola's protest in Boston were dismissed on First Amendment grounds. (App.3904-13). It is clear that Gazzola's chants at this protest, when viewed in the context of a public demonstration on a city street with police officers standing nearby, *see* Ex. 4006, App. 2980, was mere political hyperbole. *See, e.g., Watts v. United States*, 394 U.S. 705, 706-08 (1969). The Government's description of Gazzola's speech as a true threat because she threatened that "she and the mob would burn his house to the ground" (187, 182) is likewise hyperbole.

associations could not form the basis for the criminal convictions because they were fully protected by the Constitution.

The Government asserts that "the First Amendment is designed to protect speech and expressive conduct that seeks to persuade or open a dialogue for a free exchange of ideas." (p. 134). While this statement is technically true, it is misleading in that it fails to acknowledge that the First Amendment protects much more than the lofty ideals of persuasion, dialogue, and the free exchange of ideas. In fact, as the Supreme Court has clearly recognized, "a principal 'function of free speech under our system of government is to invite dispute. Ironically, it may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger.'" *Texas v. Johnson*, 491 U.S. 397, 408-409 (1989) (citations omitted). Even offensive, disturbing, and provocative speech is protected. *Planned Parenthood v. Amer. Coalition of Life Activists*, 290 F.3d 1058, 1080 (9th Cir. 2002). But, "above all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dept. of Chicago v. Mosley,* 408 U.S. 92, 95 (1972). As such, the First Amendment ordinarily denies a State "the power to prohibit dissemination of social, economic and political doctrine which a vast

majority of its citizens believes to be false and fraught with evil consequence." *Whitney v. California,* 274 U.S. 357, 374 (1927) (Brandeis, J., concurring).

Indeed, "[i]t hardly needs repeating that '[t]he constitutional guarantees of freedom of speech forbid the States to punish the use of words or language not within 'narrowly limited classes of speech.'" *Hess v. Indiana*, 414 U.S. 105, 107 (1973) (citations omitted); *Chaplinsky v. New Hampshire,* 315 U.S. 568, 571-572 (1942) ("There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which has never been thought to raise any Constitutional problem"). Absent the application of one of these exceptions, the First Amendment prohibits governments from criminally prosecuting individuals based on their exercise of their right to engage in association, protected expression, and expressive conduct. *See Chaplinsky*, 315 U.S. at 571-72; *Dombrowski v. Pfister*, 380 U.S. 479, 487 (1965).

Therefore, because there was no evidence that Ms. Gazzola personally or directly engaged in any of the illegal activities that make up the underlying offenses and because the only way she was even indirectly tied to the activities which constituted illegal conduct was through her speech and associations with others in the animal rights campaign, the convictions cannot stand unless the Government can

prove that her speech fell within one of those narrow exceptions to the protections of the First Amendment.

At trial the Government resorted to several distinct yet related theories in an effort to ram her speech into one of these "certain well-defined and narrowly limited classes of speech" which may be punished consistent with the Constitution. *See* App.3185-90, 3136 ("there are several grounds upon which this jury can conclude that the campaign was not at all about the First Amendment protected speech. The first is the incitement issue, whether or not it incited violent action. The second is whether or not they engaged in threats. And the third is whether or not they directed or steered others, instructed others to commit illegal acts."). In her Appellant Brief, Gazzola argued that none of these categorical exceptions to the First Amendment's protections would or could apply to her speech in the present case, and thus why there was insufficient evidence to convict. In its Appellee Brief, the United States again attempts to demonstrate that Ms. Gazzola's speech could be criminalized by trying to force the facts of this case into any one of these exceptions. However, as is shown below, the Government's arguments are misplaced, both factually and legally. And despite the Government's sweepingly expansive and novel theories regarding these otherwise narrow and well-delineated exceptions to the First Amendment, it is submitted that upon closer examination each of these approaches must fail.

10

**A.    Gazzola's Expressive Activities Could Not Be Proscribed Under the "Incitement" Doctrine.**

Despite its protestations to the contrary, the United States is indeed attempting to hold Ms. Gazzola and her co-Defendants criminally liable for simply advocating and defending the criminal actions of others. *Compare* Appellee Brief 114 ("The defendants are subject to these statutes *not because of their speech*, but because they employed, directed, and/or aided and abetted the illegal means and goals prohibited by these statutes") *with* 129 ("Indeed, even under *Brandenburg*, the defendants here do not prevail because their coordinated efforts (including their use of the SHAC website) *incited numerous acts* of violence against SHAC's targets") (emphasis added).

Indeed, even a cursory review of the Government's Brief reveals that its theory of the case seeks to impose criminal liability upon the Defendants for merely "advocating," "encouraging," "publicizing," and "supporting" criminal acts, which were later committed by others, or for "defending," "bragging about" or "gleefully reporting" on these actions after they were committed. *See, e.g.*, Appellee Brief 202 ("one of the ways the defendants conspired to [violate the AEPA] was through *encouraging* others to attack HLS and its business partners. It was further alleged that the defendants *encouraged* others to 'operate outside the confines of the legal system' and engage in illegal 'direct action,' which included vandalism, threatening

11

telephone calls, sending black faxes, and other actions.... the conspiracy was furthered through the *reporting* that was done on the SHAC website, which *encouraged* further similar acts in order to intimidate, harass, and threaten the targets of SHAC's campaign"); p.203 ("stalking counts describe ... the acts of vandalism and intimidation that were *encouraged by the defendants and committed by non-defendants*); *see also* p.5 ("Gazzola appeared on a Seattle radio show ... *defending* the [smoke] bomb[]s" that were set off by others in a building); p.9 ("SHAC *supported* the use of 'direct action'"); *id* (SHAC website's disclaimer that they "*recognize, and support*, those who choose to *operate outside the confines of the legal system* ...[and] *encourage people to support direct action when it happens and those who may participate in it*") (italics added *by the Government*); *id*. ("SHAC website *explicitly advocated* taking illegal action"); p.10 ("SHAC's *support and approval* of the violent and illegal conduct of activists"); p.12 ("SHAC's website would *regularly report on* acts of intimidation and violence.... they were *gleeful or gloating reports* that were *frequently sprinkled with explicit words of encouragement* for continued similar activity"); p.14 ("This sarcastic comment [not to get any "funny ideas" regarding the "Top 20 Terror Tactics"] ... made it clear that SHAC was *indeed encouraging* the use of these tactics by its audience of activists"); p.15 (SHAC would post personal information and "*encourage* its supporters to take 'direct action'"); p.18 ("SHAC also

12

*advocated* what its leaders called, 'electronic civil disobedience'"); p.19 ("*encouraging* activists to engage in electronic civil disobedience"); p.20 ("SHAC *advertised* ... Black Fax Mondays" and "sent emails directly to lists of supporters *encouraging* them to participate"); p.21 ("SHAC website *explicitly urged* its viewers to make harassing anonymous phone calls to HLS employees"); p.36 (SHAC newsletter "*bragged about* the liberation (i.e., theft) of 14 beagles from HLS" and "*accurately reported* that there was an illegal break-in at HLS"); p.40 ("SHAC *encouraged* its supporters to engage in phone blockades, e-mail attacks, black fax campaigns, website attacks, and other actions designed to disrupt the business"); p.43 ("website *gleefully reported on*" the success of activists); p.45 ("website also *bragged about* acts of vandalism"); p.46 ("*gleefully reported* that activists" had illegally used credit card); p.47 ("website *publicized* an attack" on ATM machines); p.51 ("acts of vandalism *were reported* on the SHAC website *and 'enthusiastically welcomed'*"); p.56 (Gazzola "*defending* the [smoke] bombings" of an office building); p.62 ("website *triumphantly reported* this vandalism"); p.64 ("website *reported on* the demonstration" at Harper's house); p.65 (vandalism at Harper's home "*reported gleefully by* SHAC's website"); p.67 ("SHAC sent an email to a list of supporters *crowing about* the victory"); p.71 ("While officially disclaiming responsibility for the actions of others, SHAC *openly encouraged* these illegal actions"); p.74

13

(summarizing argument as "SHAC *espoused, and encouraged* its followers to engage in, what it termed 'direct action'"); p.78 ("**These defendants went *well beyond legitimate protest activities; they knowingly and willfully supported the use of illegal 'direct action' tactics against HLS***"); p.119 (website "*gleefully recounted*" direct action); p.120 ("website and newsletters *explicitly endorsed* the use of illegal 'direct action'"); *id.* ("SHAC *both encouraged and applauded*" direct action); p.123 ("SHAC *explicitly endorsed* the use of illegal 'direct action' tactics *and publicly defended them when they occurred*"); ("defendants *ratified [direct action] by praising it* on their website *and encouraging* similar action in the future"); p.128 fn.22 (attempting to distinguish *Brandenburg* and *Noto* because "SHAC *engaged in a call to* illegal action" and "the individual defendants here *fully embraced* the use of illegal direct action techniques"); p.131 ("defendants made it quite clear that *supporting* 'any action' included *supporting* illegal direct action tactics"); pp.131-32 ("it is difficult to interpret sarcastic statements on the SHAC website ... as anything other than *encouraging* the described illegal actions"); p.161 (defendants' "own words demonstrated their *embrace of* the illegal means used by SHAC in furtherance of their common goal"); p.183 ("website *glorified* acts of violence and vandalism"); p.212 ("SHAC's *encouraging* specific harassing actions"); pp.227-28 ("website of SHAC *celebrating* the smoke-bombing" and Gazzola "*supported*" this terror tactic);

14

p.235 ("**admissions made by Gazzola during [Seattle] radio show were extremely revealing about her state of mind and intent**.... Gazzola stated that '*we support property destruction*,' ... '*we support* illegal action'" and she "*justified* the beating" of Brian Cass); p.237 ("Gazzola *completely justified* the use of economic sabotage .... *In fact, she compared it to the Boston Tea Party*"); p.243 (Gazzola "*defended* outrageous conduct, *admitted favoring* the use of illegal means, and *sought to justify* such steps"); p.280 ("*conspirators encouraged* 'telephone calls ... in an attempt to place [HLS employees] in reasonable fear" and the "conspiracy's *encouraging* of telephone calls threatening injury to persons or property was plainly relevant"); p.155 ("defendants here *did not engage simply in lawful protest, but instead they each embraced the use of illegal 'direct action' tactics* in order to achieve their common goal") (emphasis added).

As its Appellee brief makes clear, no matter how much the Government attempts to deny it, it *is* hereby attempting to punish Gazzola for simply advocating and defending the illegal actions of others. However, as was throughly discussed in Gazzola's initial Brief, under *Brandenburg v. Ohio*, 395 U.S. 444 (1969) and its progeny such speech cannot be criminalized because it was neither directed to inciting imminent lawless action nor likely to produce such action. *See* Gazzola Brief 42-50.

15

First, there was no incitement since those who participated in illegal action after allegedly viewing information on the SHAC websites made a conscious, considered, and independent decision to act upon the information provided. As explained by Jeffrey Dillbone, the *only* witness put on by the government who admitted to viewing the SHAC websites and committing an illegal act, "I did it on my own free will as SHAC simply provided me with the information." (App.2895; *See also* Gazzola Brief 26-27).

Second, the Government failed to show that the speech attributable to Gazzola caused any *imminent* lawlessness since any and all illegal action which was allegedly inspired by the writings on the SHAC websites was necessarily remote and disconnected–both temporally and geographically–from the expressive activity. Indeed, in a futile attempt to distinguish *Brandenburg*, the Government claims that "[a]fter companies and their employees were targeted for 'direct action,' acts of violence followed soon thereafter, which would satisfy any requirement of 'imminence' under *Brandenburg*." (Appellee Brief 129). Putting aside for the moment the fact that there was *absolutely no evidence* that *any violence* occurred "soon after" companies or employees were targeted, this statement is simply an inaccurate description of the incitement doctrine and demonstrates the Government's fundamental misunderstanding of the First Amendment's protections. Illegal acts

(even violence) that follows "soon after" speech cannot give rise to criminal liability under *Brandenburg*; rather, the acts must be *imminently* incited by the speech. *See, e.g., United States v. Bell*, 414 F.3d 474, 483 n.9 (3rd Cir. 2005) ("[R]eliance on *Brandenburg* ... without reference to imminence–is erroneous. Under *Brandenburg*, only speech inciting *imminent* lawless action may be restricted.") (emphasis in original); *Hess*, 414 U.S. at 108 (overturning defendant's conviction of antiwar protestor who yelled "We'll take the fucking street later" because "at worst, it amounted to nothing more that advocacy of illegal action *at some indefinite future time*.") (emphasis added). Here, even assuming, *arguendo*, that there was advocacy for lawbreaking, such advocacy was not directed to inciting or producing *imminent* lawless action.

And finally, as is shown below, the speech at issue was clearly not "preparing a group for *violent* action and steeling it to such action," *see Brandenburg*, 395 U.S. at 448 (emphasis added), since all the speech attributable to the Defendants consistently and unwaveringly expressed opposition to all forms of violence, whether it be towards animals or people. *See generally* Gazzola's Brief 34-35, 39-40, 52-54.

Therefore, no matter how much the Government tries to escape it, *Brandenburg* and its progeny are controlling on the facts of this case, they preclude criminal liability for mere abstract advocacy, and, as such, they mandate that as a matter of law

17

all of the above-described speech is insufficient to justify the convictions of Gazzola or her co-Defendants.

### B. Ms. Gazzola's Expressive Activities Could Not be Punished Under the "True Threats" Doctrine.

It bears repeating that any statute that criminalizes a form of pure speech "must be interpreted with the commands of the First Amendment clearly in mind. Therefore, what is a threat must be distinguished from what is constitutionally protected speech." *Watts v. United States,* 394 U.S. 705, 707 (1969). For threats to be criminalized under the interstate stalking laws as speech not inconsistent with the First Amendment's protections: (1) the speech must be intended to place the victim in fear of death or serious bodily harm; (2) that fear of death or serious harm must be reasonable; *and* (3) a reasonable speaker must be able to foresee that the speech would be interpreted as a serious expression of intent to inflict injury or death. *See* 18 U.S.C. § 2261A(2); *Virginia v. Black*, 538 U.S. 343, 360 (2003); *United States v. Zavrel*, 384 F.3d 130, 136 (3rd Cir. 2004); *see also* Gazzola Brief 29-30, 32-34. Moreover, it is essential that these factors be considered and analyzed within both the immediate context of the words themselves and within the larger historical context of the speech and its allusions. *See, e.g., Watts*, 394 U.S. at 706-707; *Black*, 538 U.S. at 349-360.

18

In the present case, the Government has failed to muster sufficient evidence to demonstrate that a reasonable person would objectively fear of death or serious bodily injury based on the threats alleged, that the defendants intended to place any person in such reasonable fear, or that the alleged threats were even communicated.

First, the Government has not even attempted to refute Gazzola's argument that the alleged threats were never communicated by the Defendants to the alleged targets. As Gazzola pointed out in her Appellant Brief, in every instance the speech that supposedly constituted a threat was merely put on a public website that was directed to other members of the animal rights community, but which was eventually forwarded to the alleged victims by an unrelated third party. (*See* 31-32). The Government has pointed to no evidence from the trial to dispute Gazzola's claim that neither she nor anyone she allegedly aided and abetted or conspired with ever sent any threatening communication directly to any supposed victim, nor that they directed the third parties to do so. As such, the "threats" were not communicated within the courts' interpretation of the true threats doctrine. *See, e.g., U.S. v. Fenton*, 30 F.Supp.2d 520, 522-27 (W.D.Pa. 1998); *U.S. v. Bellrichard,* 779 F.Supp. 454 (D.Minn.1991), *aff'd,* 994 F.2d 1318 (8th Cir.1993). Thus, for this reason alone, Gazzola's speech could not form the basis for a conviction on the interstate stalking counts.

19

Nonetheless, even if the speech at issue was "communicated," the evidence at trial still failed to establish that the speech was outside the protections of the First Amendment because, under an objective standard, a reasonable speaker would not foresee that the statements would be interpreted by its recipient as a true threat, nor would the recipients have an objectively reasonable fear of death or serious bodily injury from these words.

The Government endeavors to make much of the *Planned Parenthood* case, 290 F.3d 1058 (9th Cir. 2002), arguing that "language far less explicit that [sic] the defendants' language here [was] held to be outside the First Amendment" in that case. (Appellee Brief 116). However, the Government's attempted analogizing to *Planned Parenthood* not only fails to support their case, but actually demonstrates why the speech here cannot be criminalized as a true threat.

As the Government acknowledges, "context is critical in a true threats case and history can give meaning to the medium." (Appellee Brief 118 (quoting *Planned Parenthood*, 290 F.3d at 1078-79)). Thus, the Government concedes, "**whether the stalking victims perceived themselves to be in danger of violent attack from SHAC's supporters can only be determined in light of the history of attacks against HLS's employees and customers**." (Appellee Brief 233) (emphasis added). Under this (correct) analysis, it *may* have been reasonable for the alleged targets to

20

fear (at most) vandalism or property damage, but clearly it would *not* be reasonable under an objective standard for these persons to fear death or serious bodily injury–at least not when considering the historical context of SHAC's activities. Neither would it be objectively reasonable for the Defendants to foresee that their statements would be interpreted by any recipient as a true threat. This is because, unlike in *Planned Parenthood*, in the case *sub judice* there was no history of violence, there was certainly no pattern of speech followed by murder or assault, and there was definitely no context of death or bodily injury being caused or even advocated by anyone involved with the campaign. To the contrary, the evidence in the present case revealed a history of peaceful (though occasionally obnoxious) protests and home demonstrations, a pattern of speech followed by political activism and protest that included (at most) vandalism and property destruction, and a context of non-violent campaigning by political activists who genuinely fought *against* violence of any sort.

The *Planned Parenthood* Court found the speech at issue there to be a true threat because "no one participating in selecting these particular abortion providers for such a poster or publishing it, could possibly believe anything other than that each would be seriously worried about being next in line to be shot and killed..... [the speakers] had every reason to foresee that its expression of intent to harm ... would elicit this reaction." 290 F.3d at 1085-86. This was because "the context of the

poster pattern–poster followed by murder .... [was] precise in their meaning to those in the relevant community" since several persons who had been identified in the same manner had been murdered in the recent past. *Id.* In other words, "the poster format itself had acquired currency as a death threat for abortion providers" and thus "these posters meant 'You're Wanted or You're Guilty; You'll be shot or killed.'" *Id.* at 1080, 1085-86.

By contrast, when one objectively considers the history of actions that followed from the SHAC website, the last thing anyone would reasonably expect when their personal information was posted on the SHAC website would be to suffer any type of physical injury or death. This is because, throughout the entire SHAC campaign, there was only *one* incident where physical violence was ever directed at any individual. (App.2730, 2828).[2] That single isolated incident of violence, involving Brian Cass, the CEO of HLS, occurred in England in 2001 and was perpetrated by two unidentified persons and a man who was never shown to be in any way

_____

[2] Indeed, the posting of one's personal information by SHAC most likely meant one would experience demonstrations at their home or office (often subject to time, place, and manner injunctions), possibly annoying calls or visits, occasional vandalism and pranks, or–just as likely–nothing at all. Moreover, the Government's claim that "none of the stalking ... would have occurred if the defendants had not targeted them and then provided the victims' personal information" (p.184) is categorically false. As but one example, the first posting of Robert Harper's address appeared in a protest writeup only *after* activists had already protested at his home in Boston. (See App.1222). There was no evidence that Harper's home address or personal information was published by SHAC prior to this incident.

associated with SHAC USA. The Government argues that, "[a]s in *Planned Parenthood*, the First Amendment does not protect defendants' speech *due to the pattern of violence* and vandalism that the defendants knew arose as a result of their website postings and other communications." (Appellee Brief 120) (emphasis added). However, the evidence belies this claim that there was a "pattern of violence." The fact that one person was assaulted in five-plus years, one person out of hundreds targeted for protests and direct action, one person who lived in another country and was not even a target of SHAC USA, simply cannot and does not give rise to a *reasonable* fear by a reasonable person to understand the speech at issue here as a serious expression of intent to inflict serious injury or death.

Nonetheless, the Government attempts to make much ado about the Cass incident by referencing it numerous times throughout their Appellee Brief (*see, e.g.*, pp.26-28, 55, 66, 130, 183).[3] Yet, this overemphasis by the Government on a single

---

[3]The Government also attempts to make much of two pipe bombs that exploded at Chiron buildings on August 28, 2003 (pp.67-71, 130, 182), but this event adds nothing to the Government's argument. First of all, *this incident occurred nearly a year after the activity allegedly yielding all of the substantive stalking counts and the conspiracy count ended* in December 2002, and thus as a matter of law cannot be evidence of the alleged crimes. (App.231-35). Second, and just as importantly, there was absolutely no evidence that Gazzola was in any way involved with the persons who committed this act, nor that she entered into any agreement, either explicit or implicit, to commit this unlawful act, nor that she had any intent that this act be committed. As such, despite the Government's implications to the contrary, Gazzola cannot be held criminally liable for these actions.

23

anomalous and largely unrelated event must be contrasted with what the alleged targets actually knew of this event *at the time*, as well as what Ms. Gazzola and the other Defendants thought, what they communicated, and, most importantly, what they intended in this regard.

First of all, the very limited, almost nonexistent, references to Cass and his assault by any of the Defendants can only be seen as a conscious choice *not* to reference this violence. The dearth of such evidence is especially pronounced when contrasted with the prolific and blunt nature of all the other speech–both on the websites and as shouted by the various protestors at the demonstrations. As is evident from the record, the Defendants here did not mince words or hesitate to speak their minds. To the contrary, they would print or say nearly anything, often in the form of intentional exaggeration, hyperbole, heated rhetoric, shocking images, and grandstanding, in order to get their points across. Thus, undoubtedly if they had intended their "targets" to experience fear of death or bodily violence, they would have drawn attention to, emphasized, and exaggerated the beating of Cass as the head of HLS. And they would have made sure that this information was directly received, loud and clear, by the recipients of these alleged threats.

Simply put, considering their *modus operandi* as unapologetic "in-your-face" direct action demonstrators, if these Defendants or their alleged conspirators intended

to threaten people by reference to Brian Cass's assault, they would have made use of his story and his image frequently, prominently, and unambiguously. Yet there is *not one scintilla* of evidence that anyone at SHAC intentionally communicated to any so-called stalking victim about the assault. Indeed, there were only four or five references to Cass throughout the whole record that could in any way be attributable to the Defendants. And *none* of these references demonstrate the intent of any of the Defendants to threaten anyone with violence since they were either not communicated to the alleged victims or simply did not even mention the assault. (*see* Gazzola Brief 53-54 & fn.17).

Thus, despite the Government's attempt to overemphasize the beating of Brian Cass as somehow indicative of the SHAC campaign, the Defendants here had nothing to do with it, they did not "glorify" or "support" that incident (p.79), and they certainly did not (as the Government asserts) "exploit the violence of this attack in order to create fear in their own targets." (p.130). And considering that this was the *only* physical injury in the history of the SHAC campaign, there was not sufficient evidence to establish that any of the recipient's professed fears of death or bodily harm was objectively reasonable, nor was there sufficient evidence to show a reasonable speaker would foresee that the alleged threats would place the recipient in fear of death or serious bodily injury.

25

\* \* \*

In their Appellee Brief, the Government also unsuccessfully attempts to distinguish the case of *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982), but again the Government's argument in this regard only further demonstrates why the Defendants' speech in the present case cannot be criminalized. The Government asserts that "[c]rucial to the Court's finding of no liability for the NAACP was that ... there was no evidence that the NAACP encouraged or authorized the relatively few incidents of violence that had occurred, or even had knowledge of them." (Appellee Brief 122). The Government then claims that "[h]ere, in contrast, there is ample evidence that the defendants had knowledge of and ratified the illegal stalking, vandalism, and destruction that occurred in support of its campaign to close HLS." (*Id.* at 123).

What the Government again fails to acknowledge, however, is that "vandalism" and "destruction" (at least of property–the only evidence in this case) are simply insufficient to satisfy either the stalking statute or the true threat exception to the First Amendment. *See, e.g.*, 18 U.S.C. § 2261A(2) (requiring "reasonable fear of ... *death ... or serious bodily injury*"); *R.A.V. v. City of St. Paul*, 505 U.S. 382, 388 (1992) ("[T]hreats of *violence* are outside the First Amendment") (emphasis added). As to the Government's conclusory argument that Defendants "had knowledge of" or

26

"ratified" violence or illegal stalking, to paraphrase the Court in *Claiborne*, "[t]he evidence in the record suggests the contrary.... [Such acts] were directly contrary to [the Defendants'] policy [of non-violence]. Similarly, there is no evidence that [any of the Defendants] ratified–or even had specific knowledge of–any of the acts of violence or threats of discipline associated with the boycott." 458 U.S. at 930-31.

The Government argues that the Supreme Court in *Claiborne* excused Charles Evers from individual liability "because of the generally political and non-violent context in which the remarks were made, and because they were not followed by acts of violence and were unsupported by other evidence that he authorized, ratified, or directly threatened violence." (Appellee Brief 123). That is exactly what happened here: this was an extremely political and entirely non-violent campaign; no speech was followed by violence; and no Defendant ever authorized, ratified, or directly threatened violence. Indeed, the facts and the speech in *Claiborne* contained much more violent undertones and references than did the speech here.[4] And, as noted above, there was only one act of physical violence in all of SHAC's history, and it certainly was neither ratified nor authorized by any of the Defendants. Thus, by the

---

[4]For example, no one in the present case ever threatened that "we're gonna break your damn neck," nor were there any incidents where "shots were fired at a house." *Compare Claiborne*, 458 U.S. at 902, 904, 905.

Government's own reasoning (as well as the holding and rationale of the Supreme Court in *Claiborne*), Gazzola cannot be criminally liable under the facts of this case.[5]

In addressing the First Amendment issues, the Government claims that the "defendants are charged with their own conduct, not the conduct of other people," (Appellee Brief 130). However, as demonstrated here and in her Appellant Brief, the *only* "conduct" Gazzola was shown to have engaged in was her speech and associations with others in the animal rights movement. And because there was no evidence produced at trial to support a finding that Ms. Gazzola's speech was likely to incite imminent lawless action, was "speech-acts" tantamount to legitimately proscribable nonexpressive conduct, or constituted true threats, then *a fortiori*, evidence of these expressive activities could not have supported the jury's verdict.

---

[5]In her Appellant Brief, Gazzola argued that there was also insufficient evidence to show that her speech was punishable under the "speech-act" doctrine as outlined in *Rice v. Paladin Enterprises, Inc.*, 128 F.3d 233 (4th Cir. 1997). *See* pp. 40-46. In its Appellee Brief the Government does not even address this issue, and thus presumably concedes the point that the Defendants' speech cannot fit within this particular exception to the First Amendment either.

# CONCLUSION

In sum, it is respectfully submitted that, when analyzed under the correct and well-established jurisprudential standards, Ms. Gazzola's association with others in the animal rights movement and her speech that at times condoned or perhaps even advocated the illegal activities of others–which was the *only* real evidence connecting her in any way to the charged offenses–must come under the protections guaranteed by the First Amendment and, thus, as a matter of law cannot form the predicate for criminal sanctions. Thus, for the foregoing reasons, and those contained in the Briefs and Replies of her co-Defendants, it is respectfully submitted that Gazzola's convictions and sentence must be reversed.

Respectfully submitted,

SIRKIN PINALES & SCHWARTZ LLP

H. LOUIS SIRKIN (Ohio Bar No. 0024573)
SCOTT R. NAZZARINE (Ohio Bar No. 0079819)
JENNIFER M. KINSLEY (Ohio Bar No. 0071629)
SIRKIN PINALES & SCHWARTZ LLP
105 West Fourth Street, Suite 920
Cincinnati, Ohio 45202-2726
Telephone: (513) 721-4876
Facsimile: (513) 721-0876

Counsel for Defendant-Appellant Lauren Gazzola

29

## COMBINED CERTIFICATION

1.     H. Louis Sirkin, Scott Ryan Nazzarine, and Jennifer M. Kinsley are all members of the bar of this Court.

2.     This brief complies with the type-volume limitation of Fed. App. R. 32(a)(7)(B).  As counted by the document summary software contained in Word Perfect Version 6.1, the brief contains 6,658 words, excluding the parts of the brief exempted by Fed. App. R. 32(a)(7)(B)(iii).  The brief is printed using the Times New Roman font, 14-point.

3.     On Tuesday, July 1, 2008, two exact copies of the foregoing brief was provided via regular U.S. mail, postage prepaid, to the following individuals:

Glenn J. Moramarco
Assistant United States Attorney
401 Market Street, 4th Floor
Camden, NJ 08101

George S. Leone
Office of the United States Attorney
970 Broad Street
Newark, NJ 07102

Peter Goldberger
50 Rittenhouse Place
Ardmore, PA 19003-2276

Andrew F. Erba
Williams, Cuker & Berezofsky
Woodland Falls Corporate Center
210 Lake Drive East, Suite 101
Cherry Hill, NJ 08002-1163

Robert G. Stahl
Laura K. Gasiorowski
Law Offices of RG Stahl, LLC
220 St. Paul Street
Westfield, NJ 07090

Hal K. Haveson
Haveson & Otis
194 Nassau Street
Princeton, NJ 08542

Paul J. Hetznecker
1420 Walnut St., Suite 911
Philadelphia, PA 19102

Robert A. Obler
Bldg. 3D, Suite 200
3131 Princeton Pike
Lawrenceville, NJ 08684

4.      The text of the electronic brief being provided to the Court as a .pdf

document and the text of the paper version of the brief are identical.

5.      A virus check was performed on the electronic brief using Symantec

AntiVirus Version 6 and no viruses were found.

SCOTT R. NAZZARINE (Ohio Bar No. 0079819)